## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TECHTARGET, INC., Plaintiff, | ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. |
| PROJECT STRATEGY GROUP, LLC, PRELYTIX, LLC., MARC LAPLANTE, MICHAEL KELLY, and SCOTT KELLY, Defendants. | ) ) ) ) ) ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## INTRODUCTION

Plaintiff, TechTarget, Inc. ("TTGT"), brings this action seeking redress against Defendants, Marc LaPlante, Michael Kelly, Scott Kelly, Project Strategy Group, LLC, and Prelytix, LLC (collectively the "Defendants"), because of Defendants' violations of, *inter alia*, the Computer Fraud And Abuse Act, 18 U.S.C. § 1030 *et seq*. ("CFAA"), and the Lanham Act, including 15 U.S.C. § § 1114 and 1125. The individual Defendants are former officers and/or key employees of TTGT, who are conspiring and working in concert with each other, as well as their newly-formed competing company, initially named Project Strategy Group, LLC ("PSG"), which subsequently changed its name to Prelytix, LLC ("PLX") (collectively "PSG/PLX"), in order to misappropriate valuable proprietary, confidential, and trade secret information from TTGT. The Defendants' scheme involved gaining access to TTGT's confidential and proprietary information from TTGT's computer network and TTGT written records, and also via external electrical storage devices and other means of electronic data access and transmission, and to use the same improperly and unlawfully, and to otherwise engage in wrongful

competition, all in violation of the individual Defendants': fiduciary duties; employee relationship agreements with TTGT, including non-competition, non-hiring and non-solicitation covenants; various confidentiality covenants, and, other rights with regard to the confidentiality of TTGT's proprietary, confidential, and trade secret information, embodied in TTGT's Employee Relationship Agreements, TTGT's Code of Conduct, and, TTGT's Insider Trading Policy. In addition, and in furtherance of Defendants' wrongful competition, their newly formed company, PSG/PLX, has, *inter alia*, used and continued to use improper advertising, including comparative advertising, and related statements concerning TTGT and its products, which are literally false and/or likely to mislead and confuse consumers.

TTGT hereby seeks injunctive relief against the Defendants to prohibit them from using TTGT's proprietary, confidential, and trade secret information; to require them to return all documents and things containing or embodying TTGT's proprietary, confidential or trade secret information; to prohibit them from hiring or trying to hire TTGT's employees in violation of their respective non-hiring, non-solicitation agreements; to prohibit them from doing business with or trying to do business with TTGT's customers and prospective customers, known to the Defendants by virtue of their employment at TTGT; and, to otherwise prohibit them from breaching, as applicable, their Relationship Agreements, a Separation Agreement, the TTGT Code of Conduct, and the TTGT Insider Trading Policy, and all associated obligations to TTGT. TTGT also seeks money damages for the harm caused by the Defendants' actions, including, but not limited to, conversion of proprietary, confidential and trade secret information, loss of product development expenses, lost revenue and lost profits, and damage to TTGT's business reputation, customer and prospective customer relations and goodwill.

2

## THE PARTIES

1.      The Plaintiff, TTGT, is a Delaware corporation with its principal place of business at 275 Grove Street, Newton, Massachusetts.  TTGT is a publicly traded corporation using the NASDAQ stock symbol:  TTGT.

2.      The Defendant Marc LaPlante ("LaPlante") is an individual residing in Mendon, Worcester County, Massachusetts.  LaPlante was formerly employed as a TTGT's Vice President/Publisher.

3.      The Defendant, Michael Kelly, ("M. Kelly") is an individual residing in Mendon, Worcester County, Massachusetts.  M. Kelly was formerly employed as a TTGT's Vice-President/Group Publisher.

4.      The Defendant, Scott Kelly ("S. Kelly") is an individual residing in Brentwood, New Hampshire.  S. Kelly was formerly employed as a TTGT's Associate Publisher.

5.      The Defendant, Project Strategy Group, LLC ("PSG") is a Massachusetts Limited Liability Company duly organized on or about November 9, 2012, pursuant to the laws of the Commonwealth of Massachusetts.  PSG was allegedly formed to conduct an information technology media, procurement, consulting, collaboration and research business.  PSG's principal place of business is located at 63 South Street, Suite 270, Hopkinton, Middlesex County, Massachusetts.  LaPlante and M. Kelly were the two managers of PSG at the time of its formation and remain so at this time.

6.      The Defendant, Prelytix, LLC ("PLX"), is the successor in name and fact to PSG, after PSG filed a Certificate of Amendment to the Certificate of Organization of PSG, on or about May 9, 2013.  PLX maintains the same principal place of business at 63 South Street, Suite 270, Hopkinton, Massachusetts, as PSG.  LaPlante and M. Kelly still serve as managers of PLX.

3

## JURISIDCTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because

the Defendants' acts constitute violations of Federal law, including the Computer Fraud And

Abuse Act, 18 U.S.C. § 1030 *et seq.*, and the Lanham Act, 15 U.S.C. § 1051, et seq.

Supplemental Jurisdiction is also invoked pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this court pursuant to 29 U.S.C. § 1391(b), because the acts

complained of occurred in this jurisdictional district and division. TTGT's and PSG/PLX's

principal places of business are all located in Massachusetts. The TTGT's computers and

proprietary information to which the Defendants gained unauthorized access are also located in

Massachusetts. Further, PSG/PLX have engaged in false or misleading advertising with TTGT

customers and prospective customers also located in Massachusetts. Finally, LaPlante, M. Kelly,

and S. Kelly, are former TTGT officers and employees, and undertook all or much of the

complained of conduct to date in Massachusetts.

## FACTUAL ALLEGATIONS

9.      TTGT was founded in Massachusetts in 1999, and became a public company in

May, 2007. TTGT maintains more than 140 technology specific websites, which provide

technology marketers, innovative media that delivers unmatched reach via custom website

advertising, branding and lead-generation solutions, all built on TTGT's extensive network of

online and social media. TTGT's Activity Intelligence platform redefines how technology

buyers are viewed and engaged, based on their active projects, specific technical priorities, and

business needs. TTGT gives technology professionals and executives the information they need

to perform their jobs, from developing strategy, to making cost-effective purchase decisions and

managing their organizations' technology projects. TTGT connects technology providers with

4

targeted, qualified communities of buyers, by offering relevant editorial content as well as active

online communities in the TTGT universe, delivering measurable results that help marketers

generate leads, shorten sale cycles, and grow revenues.   TTGT has won dozens of awards for its

media innovation and industry leadership, including more than 100 awards for editorial

excellence. TTGT's advertisers include some of the top technology companies in the world,

including but not limited to, Cisco, Dell, EMC, HP, IBM, Intel, Microsoft, SAP, and Symantec.

**Marc LaPlante**

10.     The Defendant, LaPlante, joined TTGT on or about February 1, 2000. At that

time, he executed a Relationship Agreement for Employees and Independent Contractors

("Relationship Agreement"). A copy of the Relationship Agreement dated February 1, 2000 is

attached as Exhibit A.

11.     The Relationship Agreement provides, in pertinent part, the following with

respect to "Confidential Information," "Non-Solicitation, Non-Hiring" and "Miscellaneous"

provisions,

      1.     Confidential Information.

      (a)     Employee will hold in confidence and not disclose or allow disclosure of,
either during or after Employee's employment with TechTarget, all Confidential
Information (as defined below) of TechTarget.  Upon termination of Employee's
employment or retention, Employee will immediately deliver to TechTarget all
written, printed, electronic and other tangible materials and media containing
Confidential Information, and will immediately destroy all intangible
embodiments of Confidential Information.

      (b)     "Confidential Information" means Trade Secrets and Technical
Information (as defined below) of TechTarget (or of others in the possession of
TechTarget subject to obligations of confidentiality and/or nondisclosure),
whether written or oral, including all copies, excerpts, modifications, translations,
enhancements and adaptations of all the foregoing. Confidential Information shall
not include, and Employee shall have no obligation to hold in confidence, any
information which: (a) was known to Employee prior to disclosure by
TechTarget; (b) is or becomes public knowledge without breach of this

Agreement; (c) is received by Employee from a third party, without any violation directly or indirectly of any obligation of confidentiality to TechTarget and without confidentiality restrictions, or (d) if Employee is an independent contractor, is independently developed by Employee without reference to or use of confidential information received under this Agreement.

(c)     "Trade Secrets" means all trade secrets, including without limitation proprietary, confidential or sensitive technical or business information of the type commonly embodied in drawings, designs, technical manuals, business plans, proposals, marketing and sales plans, customer lists, financial information, costs, email lists, pricing information and product application data.

(d)     "Technical Information" means all technical information, including without limitation source code, object code, procedural code, documentation, manuals, product plans, technical know-how, technical data, performance data, product specifications and other information of a technical nature...

3.     <u>Employee Non-Solicitation and Non-Hiring Covenant</u>. For a period of one (1) year after the termination of Employee's employment with TechTarget, Employee will not recruit or solicit, offer employment to, or employ any person who was an employee or independent contractor of TechTarget on or within six (6) months before the date of such termination...

7.     <u>Miscellaneous</u>. (d) Employee recognizes that irreparable injury, which could not be adequately compensated by money damages, may result to TechTarget.com if employee breaches the promises Employee has made in this Agreement, and then Employee's Employment or retention is based on those promises. Employee therefore agrees that in the event of Employee's breach or threatened breach of any of those promises, TechTarget.com shall be entitled to injunctive or other equitable relief restraining such breach or threated breach, without having to prove (beyond entering this Agreement into evidence) either the fact of irreparable injury or the inadequacy of money damages. Such relief shall be without prejudice to any other remedy to which TechTarget.com."

12.     On or about August 18, 2008, LaPlante entered another Relationship Agreement for Employees with TTGT. A copy of this second Relationship Agreement dated August 18, 2008, is attached as Exhibit B. The provisions in this second Relationship Agreement are substantially identical to the first with respect to the treatment of confidential information, and employee non-solicitation and non-hiring. In addition to the foregoing provisions, this second

Relationship Agreement included an additional provision for non-competition. This second

Relationship Agreement provides, in pertinent part,:

> "7.   Non-Competition. In consideration of your promotion, continued employment and the severance benefits granted pursuant to Section 8 below, the Employee agrees as follows:
>
> (a)   during the period of Employee's employment by TechTarget and for a period of six months after the termination of Employee's employment with TechTarget for any reason, Employee will not without TechTarget's prior written consent in each case, work for, function as an independent contractor or solicit or accept business from, any person or entity that is a competitor of TechTarget. For purposes of this agreement, a competitor would include any of the following: (a) a media company that publishes technology-related content or derives its revenue from selling products or services similar to products or services offered by TechTarget to customers or prospects similar to TechTarget's own customer's or prospects or (b) a company which operates technology-related events that derives its revenue from selling products or services similar to products or services offered by TechTarget to customers or prospects similar to TechTarget's own customers or prospects. The Employee acknowledges that the following specific companies are considered examples of competitors of TechTarget: CNET, IDG, Accela Communications, Ziff Davis Enterprise, PennWell, JupiterMedia, 101 Communications, Penton Media, IT Toolbox, NewsFactor, Sys-Con, Fawcete, Digital Consulting, United Business MediaBM, Haymarket Media / West Coast Publishing, SANS Institute, Computer Security Institute, Reed Expo and MIS Training Institute. The employee further acknowledges that the specific companies mentioned as competitors create only a limited list of potential competitors and that other companies or entities may be deemed to be competitors based on the nature of their products or services and how they compete in the marketplace against TechTarget's customers or prospects. At the employee's request, TechTarget will update the listing of specific companies mentioned above.
>
> (b)   Employee will not engage in the actions prohibited in clause (a) directly or indirectly, or by being associated with any person or entity as owner, partner, employee, agent, independent contractor, director, officer, stockholder or in any other capacity or manner whatever. The restrictions against competition set forth in this Paragraph are acknowledged by employee to be reasonable for the purposes of protecting the businesses of TechTarget. However, if any such restriction is found by any court of competent jurisdiction to be unenforceable including because it extends for too long a period of time, over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable."

7

13.     In addition to the foregoing, TTGT maintained a Code of Business Conduct and

Ethics ("Code of Conduct") which was required to be acknowledged by each employee as a

condition of employment.  LaPlante acknowledged his obligations pursuant to the Code of

Conduct.  A copy of TTGT's Code of Conduct as acknowledged by LaPlante, M. Kelly and S.

Kelly is attached as Exhibit C.

14.     Part II, Paragraph E of the Code of Conduct provides in pertinent part:

"E.     Confidentiality; Proprietary Information

Proprietary information of the Company and its clients and partners plays a vital
role in the Company's business, its ability to compete and its future prospects.
Directors, officers and employees may not, at any time, without the Company's
prior written permission, either during or after service to, or employment with, the
Company, (a) discuss the Company's business or otherwise disclose any
proprietary information of the Company or any client to anyone outside of the
Company without proper authority, or (b) use or permit to be used any such
proprietary information for any purpose other than the performance of duties to
the Company. Each individual also has an obligation to use best efforts to prevent
the unauthorized disclosure of the Company's or its clients' proprietary
information and to deliver to the Company all copies of proprietary information
when he or she ceases to be employed by or otherwise serve the Company.

The Company's proprietary information may include information or material
which has not been made generally available to the public, such as: (a) corporate
information, including plans, strategies, methods, policies, resolutions,
negotiations or litigation; (b) marketing information, including strategies,
methods, customer identities or other information about customers, prospect
identities or other information about prospects, or market analyses or projections;
(c) financial information, including cost and performance data, debt arrangements,
equity structure, investors and holdings, purchasing and sales data and price lists;
(d) operational and technological information, including plans, specifications,
manuals, forms, templates, software, designs, procedures, formulas, discoveries,
inventions, improvements, concepts and ideas; and (e) personnel information,
including personnel lists, reporting or organizational structure, resumes, personnel
data, compensation structure, performance evaluations and termination
arrangements or documents. Proprietary information also includes information
received in confidence by the Company from its clients or other third parties.

All employees should refer to the "Relationship Agreement For Employees" that
you executed with the Company for more detail on your contractual obligations
with respect to confidential information and other related matters."

8

1743251.1

15.    Part III, Paragraph B of the Code of Conduct provides in pertinent part:

"Disciplinary measures for violations of the Code may include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension with or without pay, demotions, reductions in salary, termination of employment or service and restitution."

16.    TTGT also maintained a Policy on Insider Trading and Disclosure ("Insider Trading Policy"). TechTarget became a public company in 2007. At that time, each employee was required to acknowledge the Insider Trading Policy and Insider Trading Procedures. An email was sent companywide on May 17, 2007 and confirmation was also required by all employees. Confirmations were held on a spreadsheet. A copy of the 2007 Insider Trading email and Spreadsheet are attached as Exhibit D. LaPlante acknowledged his acknowledgement, and agreement to abide by the terms of the Insider Trading Policy, on or about June 15, 2007. A copy of the Insider Trading Policy is attached as Exhibit E. A copy of LaPlante's Insider Trading acknowledgement is attached as Exhibit F.

17.    The Insider Trading Policy acknowledgement executed by LaPlante on June 15, 2007, provides as follows:

"**ACKNOWLEDGMENT**

I hereby acknowledge that I have read, that I understand, and that I agree to comply with, the Company Policy On Insider Trading and Disclosure (the "Insider Trading Policy") and the Insider Trading Procedures (the "Insider Trading Procedures") of TechTarget. Inc. (the "Company"). I also understand and agree that I will be subject to sanctions, including termination of employment, that may be imposed by the Company, in its sole discretion, for violation of the Insider Trading Policy and the Insider Trading Procedures, and that the Company may give stop-transfer and other instructions to the Company's transfer agent against the transfer of Company securities by the undersigned in a transaction that the Company considers to be in contravention of the Insider Trading Policy and Insider Trading Procedures."

9

**Michael Kelly**

18.     The Defendant, M. Kelly, joined TTGT on or about October 29, 1999.  At that

time, he countersigned an Offer Letter of Employment ("Offer Letter") dated October 28, 1999.

A copy of the Offer Letter is attached as Exhibit G.

19.     The Defendant, M. Kelly, subsequently executed a Relationship Agreement for

Employees and Independent Contractors ("Relationship Agreement") on November 1, 1999.  A

copy of the Relationship Agreement dated November 1, 1999 is attached as Exhibit H.

20.     The Relationship Agreement provides in pertinent part the following with respect

to "Confidential Information," "Non-Solicitation, Non-Hiring" and "Miscellaneous" provisions,

    1.  Confidential Information.

    (a) Employee will hold in confidence and not disclose or allow disclosure of,
either during or after Employee's employment with TechTarget, all
Confidential Information (as defined below) of TechTarget.  Upon termination
of Employee's employment or retention, Employee will immediately deliver
to TechTarget all written, printed, electronic and other tangible materials and
media containing Confidential Information, and will immediately destroy all
intangible embodiments of Confidential Information.

    (b) "Confidential Information" means Trade Secrets and Technical
Information (as defined below) of TechTarget (or of others in the possession
of TechTarget subject to obligations of confidentiality and/or nondisclosure),
whether written or oral, including all copies, excerpts, modifications,
translations, enhancements and adaptations of all the foregoing. Confidential
Information shall not include, and Employee shall have no obligation to hold
in confidence, any information which: (a) was known to Employee prior to
disclosure by TechTarget; (b) is or becomes public knowledge without breach
of this Agreement; (c) is received by Employee from a third party, without
any violation directly or indirectly of any obligation of confidentiality to
TechTarget and without confidentiality restrictions, or (d) if Employee is an
independent contractor, is independently developed by Employee without
reference to or use of confidential information received under this Agreement.

    (c) "Trade Secrets" means all trade secrets, including without limitation
proprietary, confidential or sensitive technical or business information of the
type commonly embodied in drawings, designs, technical manuals, business
plans, proposals, marketing and sales plans, customer lists, financial

information, costs, email lists, pricing information and product application data.

(d) "Technical Information" means all technical information, including without limitation source code, object code, procedural code, documentation, manuals, product plans, technical know-how, technical data, performance data, product specifications and other information of a technical nature...

3.   Employee Non-Solicitation and Non-Hiring Covenant.  For a period of one (1) year after the termination of Employee's employment with TechTarget, Employee will not recruit or solicit, offer employment to, or employ any person who was an employee or independent contractor of TechTarget on or within six (6) months before the date of such termination...

7.   Miscellaneous.  (d) Employee recognizes that irreparable injury, which could not be adequately compensated by money damages, may result to TechTarget.com if employee breaches the promises Employee has made in this Agreement, and then Employee's Employment or retention is based on those promises.  Employee therefore agrees that in the event of Employee's breach or threatened breach of any of those promises, TechTarget.com shall be entitled to injunctive or other equitable relief restraining such breach or threated breach, without having to prove (beyond entering this Agreement into evidence) either the fact of irreparable injury or the inadequacy of money damages.  Such relief shall be without prejudice to any other remedy to which TechTarget.com."

21.     On or about August 29, 2006, M. Kelly entered a second Relationship Agreement for Employees with TTGT.  A copy of this second Relationship Agreement dated August 29, 2006 is attached as Exhibit I.  The provisions in this second Relationship Agreement are substantially identical to the first with respect to for the treatment of confidential information, and employee non-solicitation and non-hiring.  In addition to the foregoing provisions, this second Relationship Agreement included an additional provision for non-competition.  This second Relationship Agreement provides in pertinent part:

"7.     Non-Competition.  In consideration of your promotion, continued employment and the severance benefits granted pursuant to Section 8 below, the Employee agrees as follows:

(a)     during the period of Employee's employment by TechTarget and for a period of six months after the termination of Employee's employment with

11

TechTarget for any reason, Employee will not without TechTarget's prior written consent in each case, work for, function as an independent contractor or solicit or accept business from, any person or entity that is a competitor of TechTarget. For purposes of this agreement, a competitor would include any of the following: (a) a media company that publishes technology-related content or derives its revenue from selling products or services similar to products or services offered by TechTarget to customers or prospects similar to TechTarget's own customer's or prospects or (b) a company which operates technology-related events that derives its revenue from selling products or services similar to products or services offered by TechTarget to customers or prospects similar to TechTarget's own customers or prospects. The Employee acknowledges that the following specific companies are considered examples of competitors of TechTarget: CNET, IDG, Accela Communications, CMP, Ziff Davis, PennWell, JupiterMedia, 101 Communications, Penton Media, IT Toolbox, CRM Guru, NewsFactor, Sys-Con, Fawcete, Digital Consulting, Byte & Switch, Haymarket Media / West Coast Publishing, SANS Institute, Computer Security Institute, Reed Expo and MIS Training Institute. The employee further acknowledges that the specific companies mentioned as competitors create only a limited list of potential competitors and that other companies or entities maybe deemed to be competitors based on the nature of their products or services and how they compete in the marketplace against TechTarget's customers or prospects. At the employee's request, TechTarget will update the listing of specific companies mentioned above.

(b)     Employee will not engage in the actions prohibited in clause (a) directly or indirectly, or by being associated with any person or entity as owner, partner, employee, agent, independent contractor, director, officer, stockholder or in any other capacity or manner whatever. The restrictions against competition set forth in this Paragraph are acknowledged by employee to be reasonable for the purposes of protecting the businesses of TechTarget. However, if any such restriction is found by any court of competent jurisdiction to be unenforceable including because it extends for too long a period of time, over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable."

22.     TTGT also maintained a Policy on Insider Trading and Disclosure ("Insider Trading Policy"). TTGT was taken public in 2007. At this time, each employee was required to acknowledge the Insider Trading Policy. (See Exhibit D). M. Kelly acknowledged his acknowledgement, and agreed to abide by the terms of the Insider Trading Policy on or about June 14, 2007. A copy of the Insider Trading Policy acknowledgement is attached as Exhibit J.

12

23.     The acknowledgement executed by M. Kelly on June 14, 2007 provided as

follows:

### "ACKNOWLEDGMENT

I hereby acknowledge that I have read, that I understand, and that I agree to
comply with, the Company Policy On Insider Trading and Disclosure (the
"Insider Trading Policy") and the Insider Trading Procedures (the "Insider
Trading Procedures") of TechTarget. Inc. (the "Company"). I also understand
and agree that I will be subject to sanctions, including termination of employment,
that may be imposed by the Company, in its sole discretion, for violation of the
Insider Trading Policy and the Insider Trading Procedures, and that the Company
may give stop-transfer and other instructions to the Company's transfer agent
against the transfer of Company securities by the undersigned in a transaction that
the Company considers to be in contravention of the Insider Trading Policy and
Insider Trading Procedures."

24.     In addition, M. Kelly separately acknowledge that he had reviewed and

understood the Code of Conduct. A copy of this written acknowledgment of the Code of

Conduct was signed on or about January 31, 2011. A copy of this acknowledgment dated

January 31, 2011 is attached as Exhibit K.

### Scott Kelly

25.     The Defendant, S. Kelly, joined TTGT on or about March 18, 2003. At that time,

he executed a Relationship Agreement for Employees and Independent Contractors

("Relationship Agreement"). A copy of the Relationship Agreement dated March 18, 2003 is

attached as Exhibit L.

26.     The Relationship Agreement provides, in pertinent part, the following with

respect to "Confidential Information," "Non-Solicitation, Non-Hiring," and "Miscellaneous"

provisions,

    1.   Confidential Information.

    (e) Employee will hold in confidence and not disclose or allow disclosure of,
either during or after Employee's employment with TechTarget, all

Confidential Information (as defined below) of TechTarget. Upon termination of Employee's employment or retention, Employee will immediately deliver to TechTarget all written, printed, electronic and other tangible materials and media containing Confidential Information, and will immediately destroy all intangible embodiments of Confidential Information.

(f) "Confidential Information" means Trade Secrets and Technical Information (as defined below) of TechTarget (or of others in the possession of TechTarget subject to obligations of confidentiality and/or nondisclosure), whether written or oral, including all copies, excerpts, modifications, translations, enhancements and adaptations of all the foregoing. Confidential Information shall not include, and Employee shall have no obligation to hold in confidence, any information which: (a) was known to Employee prior to disclosure by TechTarget; (b) is or becomes public knowledge without breach of this Agreement; (c) is received by Employee from a third party, without any violation directly or indirectly of any obligation of confidentiality to TechTarget and without confidentiality restrictions, or (d) if Employee is an independent contractor, is independently developed by Employee without reference to or use of confidential information received under this Agreement.

(g) "Trade Secrets" means all trade secrets, including without limitation proprietary, confidential or sensitive technical or business information of the type commonly embodied in drawings, designs, technical manuals, business plans, proposals, marketing and sales plans, customer lists, financial information, costs, email list, pricing information and product application data.

(h) "Technical Information" means all technical information, including without limitation source code, object code, procedural code, documentation, manuals, product plans, technical know-how, technical data, performance data, product specifications and other information of a technical nature...

3.  Employee Non-Solicitation and Non-Hiring Covenant. For a period of one (1) year after the termination of Employee's employment with TechTarget, Employee will not recruit or solicit, offer employment to, or employ any person who was an employee or independent contractor of TechTarget on or within six (6) months before the date of such termination...

7.  Miscellaneous. (d) Employee recognizes that irreparable injury, which could not be adequately compensated by money damages, may result to TechTarget.com if employee breaches the promises Employee has made in this Agreement, and then Employee's Employment or retention is based on those promises. Employee therefore agrees that in the event of Employee's breach or threatened breach of any of those promises, TechTarget.com shall be entitled to injunctive or other equitable relief restraining such breach or threated breach, without having to prove (beyond entering this Agreement into

14

evidence) either the fact of irreparable injury or the inadequacy of money damages. Such relief shall be without prejudice to any other remedy to which TechTarget.com."

27.     On or about May 19, 2008, S. Kelly entered another Relationship Agreement for Employees with TTGT. A copy of this second Relationship Agreement dated May 19, 2008 is attached as Exhibit M. The provisions in this second Relationship Agreement are substantially identical to the first with respect to the treatment of confidential information, and employee non-solicitation and non-hiring.

28.     TTGT also maintained a Policy on Insider Trading and Disclosure ("Insider Trading Policy"). TTGT was taken public in 2007. At this time, each employee was required to acknowledge the Insider Trading Policy. S. Kelly acknowledged his acknowledgement, and agreed to abide by the terms of the Insider Trading Policy. (See Exhibit D.)

29.     In addition, S. Kelly separately acknowledged that he had reviewed and understood the Code of Conduct. A copy of this written acknowledgment of the Code of Conduct was signed on or about December 16, 2010. A copy of this acknowledgment dated December 16, 2010 is attached as Exhibit N.

**IT DEAL ALERT**

30.     In or about 2011 and 2012, TTGT began developing a new product under the code name "Market Watch".

31.     "Market Watch" was developed by a multi-disciplinary team at TTGT, consisting of software developers, software code engineers, analytics and infrastructure specialists, publishers, and sales and marketing professionals. The team consisted of approximately 12 individuals. LaPlante, M. Kelly and S. Kelly were not on the team of TTGT employees developing "Market Watch". "Market Watch" was developed between December, 2011 and

15

January, 2013. It was launched in beta test form with eight TTGT customers on October 18, 2012, and ending on January 23, 2013.

32.     One of TTGT's principal lines of business involves registered and unregistered users who access its proprietary universe of technical internet websites. The websites are carefully calibrated by subject matter, industry sector, and using TTGT's proprietary "taxonomy," which consists of strategic key words or phrases which represent the subject matter content on pages of TTGT's universe of proprietary websites. The TTGT websites are visited by individual "contacts" identified as either registered users or by ISP address. By analyzing each individual contact's activity, TTGT is able to construct a "contact" profile as a potential buyer for technology products and services.

33.     The "Market Watch" product was conceived to offer TTGT's customers a source of aggregated individual "contact" activity at the organizational or institutional level using TTGT's proprietary Activity Intelligence platform, in order to aggregate individual "contact activity" at the "account" level. Thus, TTGT is able to offer its customers a unique and innovative picture regarding the collective behavior of institutional "contacts" on TTGT's proprietary universe of websites, which would be highly suggestive of "account" (institutional) level interests, project focus, and potential buying behavior.

34.     On or about September 26, 2012, TTGT stopped using the code name "Market Watch" and began using the Product name "IT Deal Alert™" ("ITDA"). ITDA would offer TTGT's customers information on a monthly subscription basis designed to highlight where "hot deals" were emerging across a large number of technology segments, and for targeted companies at three different levels, including small to medium business of less than 1000 employees,

1743251.1

accounts ("SMB), mid-market account of greater than 1,000 but less than 10,000 employees, and enterprise accounts of over 10,000 employees.

35.     TTGT customers using ITDA could select from three types of monthly reports including a "Hot fifty" report, a "Top 200" report, and a "Full segment" report.  The "Hot fifty" report would show fifty new sales opportunities each month demonstrating accounts uniquely on a rolling 90-day cycle.  The "Top 200" report would stack a ranking of the top 200 accounts monthly within a segment, and would provide an updated top 200 accounts each subsequent month, and showing movement within the top 200 (both up and down).  The "Full segment" report provided TTGT customers with a full list of active accounts monthly within an industry segment, and would provide an updated segment list each subsequent month, showing movement within the segment (both up and down).  The "Hot fifty" report cost $5,000 monthly (per option).  The "Top 200" report cost $10,000 monthly (per option).  The "Full segment" report cost $25,000 monthly.  A TTGT customer using the "Hot fifty" report could start/stop and/or change market segments on a monthly basis, but TTGT customers selecting the "Top 200" report or the "Full segment" report, were not allowed to stop and then resubscribe until a period of at least one year had passed, unless they paid for any missed intervening months.

36.     Prior to ITDA, no one in the lead-generation industry was offering customers this kind of detailed, targeted account-level intelligence.  TTGT intended ITDA to represent the next generation of innovative lead-generation information and intelligence to the market place.

**The Scheme**

37.     The Defendants improper scheme, and civil conspiracy, commenced upon the termination of LaPlante by TTGT on or about March 20, 2012.  Upon information and belief, LaPlante was disgruntled when TTGT changed the criteria for admission to "Club 101", a sales

17

1743251.1

winner club, which rewarded salesman and their superiors upon achieving specified sales targets. Prior to 2012, all senior publishers attended the Club 101 sales event, regardless of the publishers individual performance against their assigned quota; for 2012, TTGT determined that publishers must meet their individual quotas to attend the Club 101 event.  As a result of the changed eligibility criteria, LaPlante did not qualify to attend the "Club 101" event.  Upon information and belief, LaPlante, who had previously attended the Club 101 trip, felt justified in responding to his failure to qualify by taking his spouse to an expensive restaurant in Boston for a very expensive "fixed-price" Valentine's Day dinner, which resulted in charges of $853.34.  LaPlante paid for this dinner with his TTGT corporate credit card.  LaPlante subsequently and in violation of TTGT's expense policy, submitted the receipt and charges for this dinner on his TTGT expense report form and requested reimbursement by TTGT.  On the reimbursement form, which he signed, LaPlante included the names of two individuals who he had allegedly taken to dinner. When LaPlante was confronted concerning the amount of the restaurant invoice, he continued to lie and insisted that the receipt was for a business dinner to which he had taken customer representatives from two distinct companies.  Because the dinner was paid for by the TTGT corporate credit card, TTGT requested a copy of the underlying meal bill directly from the restaurant, and determined that the meal was for a fixed-price Valentine's Day dinner for two and not three individual diners as claimed by LaPlante.  When TTGT confronted LaPlante with this evidence, he admitted that he had lied and attempted to perpetrate a fraud on TTGT with his expense reimbursement request in violation of TTGT's Business Travel and Business-related expenses policy.  A copy of the Expense Policy is attached as Exhibit O.  Because of LaPlante's attempt at theft and fraud, his unauthorized use of the TTGT corporate credit card, and further, because he was a member of the company's Sarbanes-Oxley certification disclosure team, he

was terminated (See Exhibit C, Part II, Paragraph G of the Code of Conduct, regarding "Accuracy of Records").

38.     On or about March 27, 2012, LaPlante repaid TTGT in full for the fraudulent expense report amount of $853.34. A copy of LaPlante's check payable to TTGT dated March 27, 2012, in the amount of $853.34 is attached as Exhibit P.

39.     At the time of his termination, LaPlante was a TTGT's Vice President/Publisher. He had been at the company almost since inception, for approximately 12 years. As a result of his various positions and years with the company, LaPlante possessed and possesses a substantial amount of proprietary, confidential and trade secret information which belongs to TTGT. He is also well aware, and previously benefited from, TTGT's strong relationships with its customers. LaPlante was provided with very substantial compensation, and very generous benefits, including stock options, during his tenure with TTGT, and it was in the context of his employment and for valuable consideration, that he executed and/or acknowledged the Relationship Agreements, Code of Conduct, and Insider Trading Policy, including their restrictive covenants relating to confidentiality, non-competition, and non-solicitation and non-hiring.

40.     M. Kelly was one of LaPlante's childhood friends. Like LaPlante, M. Kelly joined TTGT almost at inception in October, 1999. At the time of LaPlante's termination, M. Kelly had been with the company for approximately 13 years. Over the years of his employment, M. Kelly played an essential role in building and expanding TTFT's publications, customer relationships, goodwill, and contractual agreements. As a result of his position and years with the company, M. Kelly possessed and possesses a substantial amount of proprietary, confidential and trade secret information which belongs to TTGT. M. Kelly is also aware of, and

19

benefited from, TTGT's strong relationships with its customers. M. Kelly was provided with

very substantial compensation, and very generous benefits, including stock options, during his

tenure with TTGT, and it was in the context of his employment and for valuable consideration,

that he executed and/or acknowledged the Relationship Agreements, Code of Conduct, and

Insider Trading Policy, including their restrictive covenants relating to confidentiality, non-

competition, and non-solicitation and non-hiring.

41.     Beginning in 2011, M. Kelly's performance was noted to be significantly

deteriorating. His below standard selling continued into the first quarter of 2012 when he only

achieved 79% of his quota. On or about April 30, 2012, TTGT, because of the continuation of

his degraded performance, poor attitude, and other unacceptable work place behavior, including

drinking alcoholic beverages during business hours at lunch, approached M. Kelly and informed

him that he would be terminated. A Separation Agreement was negotiated, which included two

(2) months severance, which was executed by M. Kelly.  A copy of the Separation Agreement

dated May 6, 2012 is attached as Exhibit Q.

42.     The Separation Agreement provides, in pertinent part, the following provisions:

> "12.   <u>You agree to not disparage the Company, its products,</u> directors, officers,
> executives, employees, strategy, prospects, customers or past transactions in any
> manner whatsoever (including through the use of any social networking sites,
> blogs, forums or any similar medium, including in response to inquiries from
> other users of such medium) and to keep all communications concerning your
> departure consistent with the message generated by the Company both internally
> and externally. <u>Furthermore, you agree to not make any negative remarks or
> comments about the Company, its products,</u> directors, officers, executives,
> employees, strategy, prospects, customers or past transactions specifically to other
> TechTarget employees, media sources and TechTarget customers. The Company
> agrees to direct those whom it makes privy to the terms of this Agreement not to
> disparage you.

> Additionally, you agree that, during the period that you remain employed by the
> Company, you will discharge your duties in a professional and workmanlike
> manner that is consistent with your role as a VP, Group Publisher of the

Company. In the event that you breach any term of this Section 12 (or any other term of this agreement), you will forfeit any and all Severance Benefits and in the event of a breach hereof prior to the Termination Date, and the company may terminate you without further notice. If the Severance Benefits have already been paid to you, you will be required to immediately return any and all applicable payments to TechTarget or TechTarget will be entitled to exercise all legal rights afforded to it to recover all such payments as well as any additional damages caused by your violations of any of the terms in this agreement.

13.    Both TechTarget and you agree to keep the terms of this agreement confidential.  You confirm and agree to return all Company property of whatever nature, including all computer equipment (including the laptop, monitor, and printer/copier/fax machine), software documentation, business emails sent while employed, sales and marketing plans, software product, technical and development plans and specifications, customer contact information, and all other materials related to the Company's business.  You also agree and confirm to return all proposals, contracts, and databases intact.

14.    This is a reminder that, as an employee of the Company, you have been in possession of certain of the Company's confidential information and have signed an Employee Relationship Agreement. This information remains confidential, which prohibits you from using, or disclosing such information to any person or entity for any purpose. You are also legally obligated to adhere to the provisions of the Employee Relationship Agreement, as they apply. You also agreed that for a period of one year from the date of the termination of your employment with the Company that you "will not recruit or solicit, offer employment to, or employ any person who was an employee or independent contractor of TechTarget on or within six (6) months before the date of such termination." Further, you agreed for a period of six months after the termination your employment for any reason, that you will not work for, function as an independent contractor or solicit or accept business from, any person or entity that is a competitor of TechTarget." [Emphasis added].

43.    The Separation Agreement concludes with the following provisions:

"This letter is intended to be legally binding. The severance payment will be made only when this Agreement is countersigned by you and returned to TechTarget by Monday, May 7, 2012. Your termination is effective as of the Termination date regardless of whether or not you sign this Agreement".

44.    The Separation Agreement included the following acknowledgement by M. Kelly

immediately prior to his signature:

"I hereby agree to the terms and conditions set forth above.  I have been given at least seven (7) days to consider this letter agreement and I have chosen to execute

21

1743251.1

this on the date below. I intend that this letter agreement become a binding agreement between me and the Company if I do not revoke my acceptance within the seven (7) day period of consideration."

45.     Upon information and belief, LaPlante and M. Kelly immediately began conceptualizing and planning a new business which, if they were not careful, would be in violation of the six-month non-competition restrictive covenant contained in the second respective Relationship Agreements signed by both (See Exhibits B and G). Upon information and belief, LaPlante and M. Kelly then actively engaged in conduct in violation of their non-competition restrictive covenants during their first six months after their termination from TTGT. LaPlante and M. Kelly organized Product Strategy Group, LLC ("PSG"), on or about November 9, 2012. Shortly thereafter, a website was activated in the late-November/early-December time period in the name of "Project Strategy Group". Although the formation of PSG was after the conclusion of LaPlante's six-month non-competition restrictive covenant, it was still within the six-month period following M. Kelly's termination from TTGT. TTGT did not immediately take any affirmative action against LaPlante and M. Kelly for allegedly violating their non-competition restrictive covenants, because the PSG website suggested that they were confining their activity to an events-based marketing and consulting business.

46.     Over the course of 2012, including after the departures of LaPlante and M. Kelly, TTGT continued the development of ITDA. During this period of time, S. Kelly remained in employment at the company in his capacity as Associate Publisher of the Networking and Security media outlets. S. Kelly is M. Kelly's older brother. S. Kelly had been employed at TTGT in two separate intervals beginning in March, 2003. Over the years of his employment, S. Kelly played a role in building and expanding TTGT's publications, customer relationships, goodwill, and contractual agreements. As a result of his position and years with the company, S.

Kelly possessed and possesses a substantial amount of proprietary, confidential and trade secret information which belongs to TTGT. S. Kelly is also aware of, and benefited from, TTGT's strong relationships with its customers. S. Kelly was provided with very substantial compensation, and very generous benefits, including restricted stock units, during his tenure with TTGT, and it was in the context of his employment and for valuable consideration, that he executed and/or acknowledged the Relationship Agreements, Code of Conduct, and Insider Trading Policy, including their restrictive covenants relating to confidentiality, non-competition, and non-solicitation and non-hiring

47.     Upon information and belief, in November, 2012, LaPlante and M. Kelly, through PSG, began soliciting TTGT customers and prospects concerning a product offering very similar to ITDA. This solicitation might have begun before TechTarget had even completed the beta testing of ITDA, and continues to the present time.[1]

48.     Early, in the first quarter of 2013, TTGT completed a successful beta test for ITDA.

49.     TTGT intended to, and did, launch ITDA in mid-January, 2013. At the close of successful beta test in the first quarter of 2013, TTGT conducted training sessions and produced and issued written materials to TTGT employees concerning the launch of ITDA. S. Kelly attended training sessions in connection with ITDA, and received TTGT's printed materials concerning the launch of ITDA. Even though S. Kelly knew that on January 4, 2013, he would resign from TTGT, on January 3, 2013, S. Kelly attended, a special detailed sales and marketing meeting related to the pending launch of ITDA and received both written materials and electronic access to materials about ITDA at the meeting.

---

[1] TTGT will disclose customer names once a proper confidentiality order for the case is established by the parties and the Court.

50.     The day after the training, on January 4, 2013, S. Kelly voluntarily resigned his position at TTGT as Associate Publisher of the Networking and Security media outlets. S. Kelly never returned any of these materials to TTGT.

51.     Upon information and belief, M. Kelly breached his fiduciary duties to TTGT during the period following LaPlante's termination on March 20, 2012, and his own termination on April 30, 2012. Upon information and belief, M. Kelly improperly accessed TTGT's computer system, and obtained for his own use and benefit without authorization, TTGT's proprietary, confidential and trade secret information, including customer lists, for use in a future business enterprise.

52.     Between March 20, 2012 and January 4, 2013, S. Kelly breached his fiduciary duties to TTGT, by acting as a double-agent, and by improperly accessing TTGT's computer system and obtained for his own use and benefit without authorization, and the benefit of the other Defendants, TTGT's proprietary, confidential and trade secret information, for use in Defendants' future business enterprise, together with LaPlante and M. Kelly. The proprietary, confidential and trade secret information obtained by S. Kelly, included information regarding "Market Watch" and ITDA, including the electronic information he obtained on TTGT's computer network, and in conversations with other TTGT employees, either alone and/or during training sessions regarding the launch of ITDA, and hard-copy documents concerning ITDA and its intended launch.

53.     For the first few months following S. Kelly's resignation from TTGT, he represented that he was engaged as an "independent consultant" for unspecified employers. Upon information and belief, S. Kelly was already working in concert, whether or not he was compensated, with LaPlante and M. Kelly in connection with PSG and its business. S. Kelly's

24

work in conjunction with LaPlante, M. Kelly and PSG, constituted a violation of LaPlante and

M. Kelly's one-year non-solicitation, non-hiring, restrictive covenants embodied in their

respective Relationship Agreements.

54.     Less than two months following the launch of ITDA by TTGT, PSG issued a

press release on or about March 20, 2013, "officially" announcing a new product by PSG/PLX

named "Project Indication Engine™" ("PIE"). This was the first press release introducing the

name "Prelytix". Upon information and belief, the name "Prelytix" combines the terms

"predictive" with "analytics", and reflects PLX's new focus on utilizing web activity data and

technology to predict when companies are likely to have projects. It also marked a substantial

change in direction for PSG, which appeared to no longer be focused on events-marketing or

consulting, but rather was now overtly competing directly with TTGT's ITDA product, and

allegedly utilizing predictive analytics as TTGT has done for years.

55.     According to PSG/PLX's marketing materials, PIE is a

> "game-changing product for IT vendors looking for the most efficient way to
> spend their sales and marketing budgets. Leveraging extensive relationships we
> have built with partners and publishers, we collect massive amounts of activity
> data about organizations across the web. Utilizing big data analytics, proprietary
> technologies & processes, and a unique scoring mechanism, we develop and
> deliver rank lists of companies likely to have IT projects based on particular
> topics." (Emphasis added).

56.     The product description for PIE is in fact substantially similar to a description of

ITDA.

57.     Approximately two months later, or on May 9, 2013, PSG filed a Certificate of

Amendment with the Secretary of the Commonwealth of Massachusetts, amending PSG's

Certificate of Organization to change the company's name from PSG to Prelytix, LLC ("PLX").

The name change from Project Strategy Group to Prelytix confirmed a completely new direction for PSG's business, and PIE is directly in competition with TTGT's ITDA product.

58.     Upon information and belief, LaPlante, M. Kelly, and S. Kelly, with the assistance of as yet unknown others, misappropriated TTGT's proprietary, confidential, and trade secret information concerning ITDA, in order to establish, PIE. It is inconceivable that LaPlante, M. Kelly, and S. Kelly, could conceive of and release a wholly new product like PIE, in just a few months when it took an experienced team of fifteen employees, including software developers, at TTGT more than a year and a half to conceive of, create, test, and launch ITDA. The Defendants were able to save substantial time and virtually all development costs, by virtue of their misappropriation and use of the proprietary, confidential and trade secret information concerning ITDA from TTGT. The proprietary, confidential and trade secret information was obtained without authorization, and in excess of their respective authority, during the period of time within which M. Kelly and S. Kelly had opportunity to access TTGT's computer system, in breach of their fiduciary duties and used their access to obtain proprietary, confidential and trade secret information about ITDA and TTGT's customers, while acting in their secret capacity as double-agents, for future use by them and PSG/PLX.

59.     Since launching PIE, TTGT has learned that PSG/PLX is marketing PIE in direct competition with ITDA. PSG/PLX has created published marketing materials which allegedly compare and contrast the features provided in both PIE and ITDA. TTGT has obtained copies of these PSG/PLX marketing materials, from TTGT's existing customers. TTGT's existing customers have informed TTGT that PSG/PLX is directly attempting to sell PIE to them instead

26

of TTGT's ITDA. A copy of PSG/PLX's marketing material which were left with a TTGT customer is attached as Exhibit R.[2]

60.     A subsequent analysis of the promotional claims made by PSG/PLX in connection with PIE, and TTGT's own promotional materials in connection with ITDA shows that approximately 30 of 54 product claims regarding PIE made by PSG/PLX, are similar or identical to attributes of TTGT's ITDA. In fact, only nine of the PSG/PLX attributes have absolutely no relationship or similarity to attributes of TTGT's ITDA. A copy of a chart illustrating the PSG/PLX PIE product claims, and their identity or similarity to TTGT's product claims for ITDA is attached as Exhibit S.

61.     TTGT's initial investigation indicates it invested 7,412 man-hours in the conception, development, testing and creation of ITDA, representing a total product development cost of approximately $532,059.00. Since November, 2012, PSG/PLX have been directly soliciting customers of TTGT in efforts to sell PIE. The list of TTGT customers being used by LaPlante, M. Kelly, S. Kelly and PSG/PLX, was derived from proprietary, confidential, and trade secret information that LaPlante, M. Kelly and S. Kelly learned during their employment by TTGT.

62.     LaPlante, M. Kelly and S. Kelly, have and continue to violate the terms of their Relationship Agreements, Code of Conduct, and Insider Trading Policy acknowledgements in connection with their misappropriation and use of TTGT's proprietary, confidential and trade secret information, together, and in concert with, PSG/PLX. This includes the creation, development, marketing and sales of PIE, and also their solicitation of TTGT customers and customer prospects, all of which they obtained or learned during their tenure at TTGT. It also

---

[2] TTGT will disclose customer names once a proper confidentiality order for the case is established by the parties and the Court.

includes the recent recruitment of Ken Kruszeski who was to be terminated by TTGT. When Mr. Kruszeski was terminated, he bragged that he planned to resign on July 5, 2013. Within one day of his termination, Mr. Kruszeski had changed his LinkedIn profile to show employment by PLX. Upon information and belief, S. Kelly recruited Mr. Kruszeski in violation of his Relationship Agreement, non-solicitation covenants.

63.     The Defendants' advertising and promotional literature, contains factual assertions concerning TTGT and ITDA, which are literally false or have no basis in fact. Further, upon information and belief, the Defendants' sales and marketing activities have included the disparaging of TTGT, its products, pricing, and ITDA, which has resulted in damage to TTGT's business reputation, and goodwill, and has cost TTGT lost revenue and lost profits concerning the sales of ITDA.

## COUNT I
### (Violation Of The Computer Fraud And Abuse Act 18 U.S.C. § 1030, et. seq. – Against All Defendants)

64.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 63, above, as if fully set forth herein.

65.     TTGT's computer systems are used in or affect interstate and foreign commerce, and are used to access the Internet. TTGT's computer systems are a "protected computer" within the meaning of the Computer Fraud And Abuse Act ("CFAA").

66.     LaPlante, M. Kelly, S. Kelly, PSG and PLX, violated the CFAA, when they, knowing and intentionally, and to perpetrate a scheme to defraud TTGT, accessed their respective TTGT-assigned computers, without authorization and/or in excess of their authorization, including but not limited to, when they took, without authorization, TTGT's valuable and protected, proprietary, confidential, and trade secret information for their own

and/or PSG/PLX's benefit. LaPlante and M. Kelly violated the CFAA when they, knowingly, and with the intent to defraud, conspired to have S. Kelly intentionally access his computer without authorization and/or in excess of his authorization, and take, without authorization, TTGT's valuable and protected, proprietary, confidential, and trade secret information. By means of this conduct, LaPlante and M. Kelly furthered their intended fraud and obtained things of value for all Defendants.

67.     TTGT has suffered damages and/or loss by reason of the Defendants' actions in violation of the CFAA.

68.     Pursuant to the CFAA, TTGT is entitled to recover damages against the defendants.

69.     TTGT seeks recovery to the full extent permitted by the CFAA, including but not limited to, loss aggregating at least $5,000.00 in value, including the development costs for IT Deal Alert, including the cost of responding to and investigating the source of the theft of information from TTGT's computer network, and the cost of conducting a damage assessment.

70.     Pursuant to the CFAA, TTGT is entitled to temporary and permanent injunctive relief enjoining the Defendants from making any further use of TTGT's valuable and protected, proprietary, confidential, and trade secret information, and requiring the return of all such documents and things containing or embodying such information, including electronic and hard-copies of same.

WHEREFORE, TTGT respectfully requests: (a) judgment in favor against the Defendants; (b) an award of damages, including pre-judgment and post-judgment interest resulting from the Defendants' actions; (c) entry of preliminary and permanent injunction requiring Defendants to return all documents and things containing or embodying the

29

proprietary, confidential and trade secret information; (d) entry of a preliminary and permanent injunction enjoining the Defendants from making any further use TTGT's proprietary, confidential, and trade secret information; and, (e) such further relief as this Court deems just and proper.

**COUNT II**
**(Breach of Contract Against Defendants LaPlante, M. Kelly and S. Kelly)**

71.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 70 above as if fully set forth herein.

72.     In exchange for valuable consideration, the parties entered into binding contractual agreements, including Employee Relationship Agreements, the TTGT Code of Conduct, and the TTGT Insider Trading Policy for the protection of business interests, including the protection of proprietary, confidential and trade secret information.

73.     By virtue of the conduct alleged above, each of the Defendants, LaPlante, M. Kelly, and S. Kelly, have violated the applicable terms of each individuals respective contracts for the protection of TTGT's business interests, including the protection of propriety, confidential and trade secret information.

74.     As a consequence of the foregoing, TTGT has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants, LaPlante, M. Kelly, and S. Kelly, on the claims set forth herein for specific performance of the respective contracts for the protection of TTGT's business interests, and proprietary, confidential and trade secret information, and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

30

## COUNT III
### (Breach of Contract Against the Defendant M. Kelly)

75.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 74 above as if fully set forth herein.

76.     In exchange for valuable consideration, the parties, TTGT and M. Kelly, entered into a binding Separation Agreement as identified above, which included the protection of TTGT's business interests, including its proprietary, confidential, and trade secret information.

77.     By virtue of the conduct alleged above, M. Kelly has violated the terms of the Separation Agreement with regard to, at a minimum, for the protection of TTGT's business interests, including its proprietary, confidential, and trade secret information.

78.     As a consequent of the foregoing, TTGT has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendant, M. Kelly, on the claims set forth herein for specific performance of the Separation Agreement for the protection of TTGT's business interests, and its proprietary, confidential and trade secret information, and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

1743251.1

## COUNT IV
**(Breach of the Relationship Agreements, Code of Conduct, and Insider Trading Policy relative to Confidentiality, Non-Competition, None-Hiring and Non-Solicitation Agreement Against the Defendants M. LaPlante and M. Kelly)**

79.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 78 above as if fully set forth herein.

80.     In exchange for valuable consideration, the parties entered into binding contractual agreements identified above, as to the protection of confidentiality of TTGT's propriety, confidential and trade secret information, and for non-competition, non-hiring and non-solicitation.

81.     By virtue of the conduct alleged above, the Defendants LaPlante and M. Kelly, have violated the terms of each individual's confidentiality, non-competition, non-hiring and non-solicitation obligations with TTGT.

82.     As a consequence of the foregoing, TTGT has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants, LaPlante and M. Kelly, on the claims set forth herein for specific performance of their respective Contractual Agreements under Relationship Agreements, Code of Conduct and Insider Trading Policy , regarding Confidentiality, Non-Competition, Non-Hiring and Non-Solicitation Agreements, and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and such other relief as this court shall deem just and appropriate.

32

## COUNT V
### (Breach of the Relationship Agreement, Code of Conduct and Insider Trading Policy relative to Confidentiality and Non-Hiring and Non-Solicitation Agreement by S. Kelly)

83.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

84.     In exchange for valuable consideration, the parties, TTGT and S. Kelly entered into the binding contractual agreements identified above as to confidentiality, non-hiring and non-solicitation.

85.     By virtue of the conduct alleged above, S. Kelly has violated the terms of his Confidentiality, Non-Hiring and Non-Solicitation Agreements with TTGT.

86.     As a consequence of the foregoing, TTGT has suffered and/or will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendant, S. Kelly, on the claims set forth herein for specific performance of his Relationship Agreements, Code of Document and Insider Trading Policy relative to the Confidentiality Agreement, and Non-Hiring, Non-Solicitation Agreements, and for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

## COUNT VI
### (Misappropriation of Proprietary, Confidential, and Trade Secret Information Against All Defendants)

87.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 above as if fully set forth herein.

1743251.1

88.    By their individual and collective actions, including those described above, all of the Defendants have wrongfully misappropriated, disclosed, and/or used certain of TTGT's proprietary, confidential, and trade secret information.

89.    The misappropriation, copying, disclosure, sharing, use, dissemination, and/or destruction of such information by the Defendants, constitutes an unauthorized copying, disclosure, or use of trade secrets and confidential information, in violation of Massachusetts Common Law and GLM c.93 § 42 *et seq.*

90.    TTGT has and will suffer substantial, immediate and irreparable harm and damages, unless the Defendants are enjoined from disclosing and using such proprietary, confidential or trade secret information.

WHEREFORE, TTGT demands judgment in its favor and against each and every Defendant on the claims set forth herein, as a result of their collective unlawful conduct for any actual and/or consequential damages, to the extent ascertainable, in an amount to be determined at trial, including injunctive and such further relief as this court shall deem just and appropriate.

## COUNT VII
### (Conversion Against All Defendants)

91.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 90 above as if fully set forth herein.

92.    The Defendants, LaPlante, M. Kelly, S. Kelly, PSG, and PLX acting in concert with and for the benefit of each other, misappropriated, without legal justification or privilege, TTGT's proprietary, confidential and trade secret information.

93.    Upon information and belief, PSG, PLX, and the other Defendants are in possession of TTGT's proprietary, confidential and trade secret information, and have failed to return such information to TTGT on demand.

34

1743251.1

94.     The Defendants have exercised acts of ownership, control, or dominion over the misappropriated, proprietary, confidential and trade secret information belonging to TTGT. Upon information and belief, the Defendants have had possession of the misappropriated information, and have used such information, in a manner that violates TTGT's rights to control the exclusive use of such information.

95.     As a consequence of the Defendants' actions, TTGT has suffered and will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendant on the claims set forth herein, enjoining their unlawful conduct, and for any actual, consequential and/or punitive damages, return of the misappropriated proprietary, confidential, and trade secret information, and other damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

### COUNT VII
### (Breach of Fiduciary Duties Against The Defendants LaPlante, M. Kelly, and S. Kelly)

96.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as if fully set forth herein.

97.     As a result of their job titles, positions, and duties and responsibilities, the Defendants LaPlante, M. Kelly, and S. Kelly, owed fiduciary duties of loyalty and care to TTGT.

98.     By their actions, including those described above, LaPlante, M. Kelly, and S. Kelly, violated their respective fiduciary duties of loyalty and care to TTGT. The violations of their fiduciary duties include, without limitation, the following conduct while the Defendants were still employed by TTGT:  (a) the submission of false expense report information, and lying to management in connection with the investigation into such expenses; (b) soliciting TTGT employees to leave their employment with TTGT; (c) planning to form a competing entity and/or

35

1743251.1

planning to join a competing entity; (d) initiating efforts to undermine or otherwise compromise TTGT business relationships with its existing customers, including soliciting or trying to solicit business for PSG and PLX from TTGT customers; and (e) misappropriating, disclosing, and/or using TTGT's proprietary, confidential, and trade secret information while employed by TTGT and thereafter.

99.     As a consequence, TTGT has suffered and will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants LaPlante, M. Kelly, and S. Kelly, on the claims set forth herein, enjoining their unlawful conduct, and for any actual, consequential and/or punitive damages, return of compensation, lost profits, training and product development costs, and other damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

## COUNT VIII
### (Civil Conspiracy Against All Defendants)

100.     TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 99 above as if fully set forth herein.

101.     The Defendants have a common plan to work together and with others to encourage and induce the Defendants and others to violate their agreements with and duties to TTGT, including taking actions to improperly recruit and hire S. Kelly and K. Kruszeski, to improperly obtain and use TTGT's proprietary, confidential and trade secret information, and unfairly and improperly compete against TTGT; and to solicit and obtain TTGT's valuable customer accounts.

102.     Each of the Defendants is aware of the plan and of the plan's purpose.

1743251.1

103.    Each of the Defendants, individually, and all the Defendants acting together, have taken affirmative steps, including those actions alleged above, to further the achievement of the plan and its purpose.

104.    As a result, TTGT has suffered and will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants on the claims set forth herein, enjoining their unlawful conduct, and for any actual, consequential and/or punitive damages, return of compensation, lost profits, training and product development costs, and other damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief as this court shall deem just and appropriate.

## COUNT IX
### (Interference With Advantageous Relations And/Or Contractual Relations Against All Defendants)

105.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 104 above as if fully set forth herein.

106.    At all times material to this claim, the Defendants knew or should have known of the existence and terms of the advantageous business relationships that TTGT enjoyed with existing and prospective customers, and the actual contractual relationships that TTGT enjoyed with its existing customers as described above.

107.    Despite such knowledge, the Defendants acting individually and in concert with each other, interfered with these advantageous business relationships and/or the existing contractual relationships between TTGT and its existing and prospective customers, by engaging in the conduct described above.

37

108.    Such interference by the Defendants was intentional, malicious, without legal justification, and was conducted by unlawful method or means for such illegal purposes.

109.    As a result, TTGT has suffered and will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants on the claims set forth herein, enjoining their unlawful conduct, and for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief, including injunctive relief, as this court shall deem just and appropriate.

## COUNT X
### (Inducement Of Breach of Contract Against PSG, PLX, LaPlante, M. Kelly and S. Kelly)

110.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 109 above as if fully set forth herein.

111.    The various contracts for the protection of TTGT's business interests, including its proprietary, confidential, and trade secret information as described above constitute valid and binding contracts between TTGT and S. Kelly.

112.    At all material times, the Defendants PSG, PLX, LaPlante, M. Kelly, and S. Kelly knew or should have known of the existence and terms of those contractual relationships as described above, between TTGT and S. Kelly.

113.    Despite such knowledge, PSG, PLX, LaPlante, M. Kelly, and S. Kelly intentionally and wrongfully induced and proximately caused the breach of those contracts for the protection of TTGT's business interest, including its proprietary, confidential and trade secret information between S. Kelly and TTGT.

38

114.   Such conduct by PSG, PLX, LaPlante, M. Kelly, and S. Kelly was willful, intentional, fraudulent, malicious, and with wanton disregard for TTGT's legal rights, without any legal justification, and was conducted by unlawful method and means for an illegal purpose.

115.   As a result, TTGT has suffered and will continue to suffer substantial and egregious harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants PSG, PLX, LaPlante, M. Kelly, S. Kelly on the claims set forth herein, as a result of their unlawful conduct and for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and such other relief, including equitable relief, as this court shall deem just and appropriate.

## COUNT XI
**(Tortious Interference With Business Expectations Against All Defendants)**

116.   TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

117.   The Defendants tortuously and with the intent to injure TTGT, use the proprietary, confidential and trade secret information that the Defendants gained through their employment with TTGT, to hire, solicit or encourage other employees to leave TTGT, including S. Kelly and K. Kruszeski.

WHEREFORE, TTGT demands judgment in its favor and against all the Defendants on the claims set forth herein, as a result of their unlawful conduct, and for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and such further relief, as this court shall deem just and appropriate.

1743251.1

## COUNT XII
### (False Advertising – 15 U.S.C. §§ 1114 and 1125 Against PSG/PLX)

118.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 117 above as if fully set forth herein.

119.    Defendant PSG/PLX's advertising of PIE, including the comparative advertising as between ITDA and PIE, as alleged above, is literally false, and even if not literally false, is nonetheless ambiguous and conveys misleading information to consumers likely to cause confusion or mistake in violation of 15 U.S.C. §§ 1114 and 1125.

120.    As a result of Defendant PSG/PLX's violation of 15 U.S.C. §§ 1114 and 1125, TTGT has suffered and continues to suffer damage and irreparable injury to the business, reputation and goodwill of TTGT and ITDA.

WHEREFORE, TTGT demands judgment in its favor and against all the Defendants on the claims set forth herein, as a result of their unlawful conduct, and for any actual, consequential and/or other damages, to the extent ascertainable, in an amount to be determined at trial, and such other relief, as this court shall deem just and appropriate.

## COUNT XIII
### (Unjust Enrichment Against PSG/PLX)

121.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 120 above as if fully set forth herein.

122.    The Defendants PSG and PLX have unjustly benefited and profited from its use of TTGT's proprietary, confidential and trade secret information, as well as by its false and misleading advertising and promotions, and other unfair, deceptive acts or practices in violation of M.G.L. c.93A, § 11, and such acts by PSG and PLX constitute unlawful acts and have resulted in unjust enrichment to PSG or PLX.

1743251.1

WHEREFORE, TTGT demands judgment in its favor and against the Defendants, PSG and PLX, on the claims set forth herein, as a result of their unlawful conduct, in an amount to be determined at trial, and such further relief, as this court shall deem just and appropriate.

### COUNT XIV
### (Violation of M.G.L. c.93A, § 11 Against LaPlante, M. Kelly, S. Kelly, PSG and PLX)

123.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

124.    TTGT is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c.93A, § 1 and § 11.

125.    The Defendants PSG, PLX, LaPlante, M. Kelly, and S. Kelly are "persons" and engaged in "trade or commerce" within the meaning of M.G.L. c.93A § 1 and § 11.

126.    The actions of the Defendants as set forth above, constitute willful and knowing violations of M.G.L. c.93A § 11. Their wrongful acts or practices include, without limitation, the following: (a) misappropriating TTGT's proprietary, confidential, and trade secret information and otherwise compromising its business reputation an goodwill; (b) tortiously interfering with TTGT's contractual relationships with its current and former employee; (c) tortiously interfering with TTGT's contractual and advantageous business relationships with its current and/or prospective customers; (d) utilizing misappropriated proprietary, confidential and trade secret information for purposes of targeting customers and prospective customers of TTGT; (e) engaging in literally false and/or misleading advertising for purposes of targeting customers and prospective customers of TTGT in violation of the Lanham Act; and (f) engaging in unfair deceptive acts or practices in violation of the Federal Trade Commission Act 15 U.S.C. §§ 41-58,, and Sections 2 and 11 of M.G.L. c.93A.

127.    As a result of the foregoing unlawful conduct, TTGT has suffered and will continue to suffer substantial, egregious, and irreparable harm.

WHEREFORE, TTGT demands judgment in its favor and against the Defendants, PSG, PLX, LaPlante, M. Kelly, and S. Kelly on the claims set forth herein, as a result of their unlawful conduct, for any actual, consequential, and/or other damages, to the extent ascertainable, in an amount to be determined at trial, including double or treble damages, attorney's fees, and such other relief, including injunctive relief, as this court shall deem just and appropriate.

## COUNT XV
### (Injunctive Relief Against All Defendants)

128.    TTGT hereby realleges and incorporates by reference the allegations contained in paragraphs 1 through 127 above as if fully set forth herein.

129.    Unless the Defendants are permanently enjoined as set forth below, TTGT will be irreparably harmed by: (a) the disruption of TTGT's relationships with its current and prospective employees; (b) the disruption to its business by the departure of TTGT employees and the projects on which they work, causing TTGT to incur the unascertainable time and resources necessary to replace and train new employees; (c) the improper disclosure, whether directly or indirectly, of TTGT's proprietary, confidential and trade secret information; (d) the improper disclosure, whether directly or indirectly, of proprietary, confidential and trade secret information of TTGT's customers which TTGT is obligated to protect; (e) the diversion of TTGT's corporate opportunities; (f) the disruption of TTGT's relationships with current and prospective customers, and the use of proprietary, confidential and trade secret information to damage of TTGT's goodwill with said current and prospective customers; (g) continued harm to TTGT's business reputation and goodwill as a result of the Defendants literally false and misleading advertising; and (h) present economic loss, which may be unascertainable at this

42

time, and may never be fully ascertainable, as well as future economic loss which is also presently incalculable.

WHEREFORE, TTGT respectfully requests that this court permanently enjoin: (1) all Defendants for a period of two years following the date of injunction, from violating the terms of any of the Defendants' agreements with TTGT concerning the protection of TTGT's business interest, including its proprietary, confidential or trade secret information, or otherwise inducing others to violate same; (2) all Defendants, for a period of two years from the date of injunction, from soliciting or doing business with TTGT's customers as expressly set forth in the Defendants' contracts for the protection of TTGT's business interests, including its proprietary, confidential and trade secret information; (3) all the Defendants, and their affiliates, associates, agents, servants or employees, from using in any way or disclosing at any time, any proprietary, confidential or trade secret information of TTGT; (4) all Defendants from doing any and all other acts as this court deems necessary, just and appropriate to protect the interests, business reputation, and goodwill of TTGT.

Respectfully submitted,
TECHTARGET, INC.
By its attorney:

*//s// William S. Rogers, Jr.*
William S. Rogers, Jr. (BBO# 549487)
Julie A. Brennan (BBO #676497)
wsrogers@princelobel.com
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
617-456-8112

Dated: July 2, 2013

43

1743251.1